### STATE v. SUTTERBY.
No. F69-128.

Court of Record, Brevard County.

November 12, 1969.

David M. Porter, County Solicitor, Norman A. Tharp and Daniel S. Ciener, Acting County Solicitors, Titusville, for the state.

James M. Russ and Charles R. Trulock, both of Orlando, for the defendant.

## JOE A. COWART, Jr., Judge.

*Order denying motion to quash search warrant (CrPR Rule 1.190(h)) and granting in part and denying in part motion to suppress admissions (CrPR Rule 1.190(i))*: In Boston, Massachusetts on Saturday, April 19, 1969, an agent of the Railway Express Agency received for shipment an unzipped black handbag addressed to the defendant, Sim F. Sutterby, 30 N. Brevard Avenue, Cocoa Beach, Florida. When the agent routinely tossed the bag onto a hand truck, it fell off, opening and disclosing its contents. Law enforcement officers were summoned, investigated, satisfied themselves the material was marijuana, notified officers in Brevard County, Florida, and then returned the contraband to the REA for shipment. Officers in Brevard County, anticipating delivery, on Sunday, April 20, 1969, obtained a warrant commanding a search of the premises, the seizure of the marijuana and the arrest of "Sim F. Sutterby or any other person or persons found violating the law in connection with the same . . ." This premises is a small young men's store owned by the defendant. At about 4 p.m. on Monday, April 21, 1969, seven[1] or more law enforcement officers made the search for the contraband they knew had been delivered. Some were visibly armed.[2] The persons then in the store were: Todd Sutterby (the store manager), his brother Bruce Sutterby, a seamstress (Valdi), a teenage salesman (Skip Grisner), and maybe one young customer. The front and back doors of the store were locked[3] and the occupants were told to sit on a couch.[4] While the search warrant was being read to Todd

---

1. Tr. 22, 30, 49, 78; Deputy Phillip R. Sellers, Detective Harry Lyons, Deputy Mark Clements, Chief Parsons, Inspector Theo York, Agent Charles Layman.

2. Tr. 40, 66, 79.

3. One officer said (Tr. 22): "I'm sure the front door was locked at one time." Another officer said (Tr. 69), " — the store was temporarily closed." Another officer said (Tr. 42, 43, 45, 46): "I believe we did close it temporarily." "I don't know whether we locked it or not. We could have." "We secured the front door. Now, I don't know whether we locked it or — I think we let some people in." "I remember securing the front door — "; "We just secured it." " — we could have locked it. I don't know." The defendant's brother is quite clear and concise: the store had three doors, one always stayed locked and the officers locked the other two doors a few minutes after they entered (Tr. 78, 79, 98, 101, 102).

4. (Tr. 48): "If you're going to stay here, sit on this couch." (Tr. 71, 72): "We asked them if they wouldn't stay there and be seated."

Sutterby, the defendant arrived and was let in.[5] Todd Sutterby was advised of his constitutional rights.[6] There is much confusion and contradiction in the testimony as to much of what happened, including whether the defendant was ever advised of his constitutional rights[7] and, if so, whether it occurred before or after he made five statements[8] which the state desires to use against him and which the defendant moves to suppress.[9] There is no question but that before[10] the defendant made any statements, he and Todd promptly and clearly indicated a desire for counsel[11] and made

---

"They were asked to sit there. There was a couch there in the store-proper. They were asked to sit there when the search warrant was executed." (Tr. 80): "And he kind of loomed up in front of me and told me to sit down on the couch. Q. And was this the man that you had observed with the gun? A. Yes, it was."

5. Tr. 4, 87.

6. Tr. 5, 87.

7. While Deputy Sellers first (Tr. 6) positively testified he gave the defendant a "Miranda" warning, later (Tr. 10) on cross examination he said, "I'm not absolutely sure." "I think I did; I'm not sure. I couldn't swear definitely that I did." (Tr. 12): "I'm not sure, no, sir."; then, still later (Tr. 12 and 13) on re-direct examination, he agreed with a leading question that he could state with a reasonable degree of certainty that he gave the "Miranda" warning to the defendant; still later (Tr. 22) on re-cross examination he siad, "— I'm not sure if I advised him of his rights *or not.* — I can't truthfully say whether I did *or not. I don't recall."* (Tr. 84, Question to Todd Sutterby: "Now, in the course of that afternoon did you ever hear Mr. Sellers or any other officer advise your brother, Sim, as to the same rights that you had been advised about? A. No, sir, I did not.")

8. (Tr. 12): "Q. All right. Now, you're not absolutely sure, as a matter of swearing here before God, under oath, that you gave that Miranda warning to Sim Sutterby before or after he made these statements, are you? A. I'm not sure, no, sir.'" (See also transcript at 13 and 14).

9. CrPR Rule 1.190(i).

10. (Tr. 21): Question by defense counsel to Deputy Sellers: "The point that I'm making is that Mr. Todd Sutterby made certain steps to get a lawyer before any statements were made by Mr. Sim Sutterby, didn't he? A. To the best of my knowledge, yes." (See also transcript pages 20, 21 and 67).

11. (Tr. 15): "Q. *Assuming* that you had already given Mr. Sutterby his constitutional rights — warning — what did Mr. Sutterby do or say? — A. He at that time made an attempt to contact an attorney — He at that time picked up the telephone and called next door to secure counsel." (Tr. 16): "— *Immediately* after advising

telephone calls and made many efforts to locate and secure counsel. During the long [12] search the store occupants were restrained in their freedom to go and come as they pleased [13] and the store occupants and the officers understood this. [14] The defendant was not permitted to go to a nearby law office to attempt to secure counsel except under a police escort. [15]

---

him of his rights, I advised him if he would like to call an attorney, the telephone was right there — to call. He said, 'Fine, I'll call and get one next door'." (See also transcript at pages 89, 90 and 91 relating to the defendant's expressions to the officers of his desire for an attorney.)

12. (Tr. 31): 25 or 30 minutes according to one officer.

13. This is evidenced in several ways, besides the locking or securing of the doors: One officer testified (Tr. 70, 71): "— we were not allowing people to enter the store during the execution of the search warrant. Q. You were not? A. No, sir. Q. How about leaving the store, were you allowing them to leave it? A. No one that was in the store prior to our entering it. Q. You didn't allow anyone in the store prior to your entering it to leave? A. That is correct." Another officer denied this (Tr. 48) saying: "We did not stop anybody that wanted to go out." However, after completing the search this same officer advised the defendant, "You are free to go *now*." (Tr. 66).

14. Deputy Sellers (Tr. 16): "— he [Sutterby] then *asked me* if he could send someone next door to get an attorney." The store manager testified (Tr. 79): "— they said I had to be in the store — I was to stay there. Q. You had to stay in the store? A. Uh-huh." (Tr. 100): "We had a seamstress in the store and she seemed a little upset and *we asked them* if we could let her go home and they said yes."

15. The defendant *asked and was given permission* to go next door to see a lawyer (Tr. 102). (Tr. 104): "— I mean, they wouldn't have let him go out of the store by himself." After it was suggested by the testimony of the witness Todd Sutterby that the defendant, Sim Sutterby, was not allowed to go alone to the nearby office of a lawyer but that an officer (Mr. Mark Clements) accompanied him there (Tr. 103, 104) and this fact was represented to the court by the defense counsel (Tr. 107), the solicitor wanted an opportunity to call Mr. Clements to deny this statement. After much discussion (Tr. 106-110) and upon the solicitor's affirmation that "this is an extremely important point" (Tr. 111), the court called a recess for this purpose. Afterwards the record (Tr. 111) notes only that counsel and the court conferred briefly at the bench. During this conference the solicitor represented that he had called Mr. Clements who was then in Cocoa and that Mr. Clements confirmed that he had accompanied the defendant when the defendant left the store to go to his lawyer's office. Counsel referred to this fact during argument (Tr. 118).

*Statements sought to be suppressed*

The setting and sequence of the defendant's alleged statements appears to be as follows —

*Statement Number One:* When they entered the premises the officers quickly observed the black handbag on the desk in the store office.[16] The store manager was directed to the office where deputy Sellers sat at the desk and read him the warrant. (Tr. 11, 12, 82, 86). Before the defendant made any statement, he first telephoned unsuccessfully then he got permission to send someone (Tr. 15-16) next door to get a lawyer (Bill Weller) who came, was let in (Tr. 99) and decided he had a conflict of interest and left (Tr. 84). Either while the defendant was waiting for Mr. Weller or right after Mr. Weller left and while no lawyer was present (Tr. 18), deputy Sellers asked the defendant (as well as others), "whose desk this was" (Tr. 6, 14); or, "Is this your desk?" (Tr. 89, 90). Deputy Sellers testifies that in response to this query the defendant admitted that the desk was his (Tr. 6). The state desires to use this admission against the defendant.

*Statement Number Two:* Deputy Sellers (not Mark Clements as per Tr. 33) then either directed Todd to open the bag or asked him to open the bag, whereupon the defendant told Todd, "Don't touch that bag." (Tr. 7, 10, 33 and 94).

*Statement Number Three:* After attorney Weller left, attorney Kirschenbaum came and left (Tr. 17, 43, 84) and the defendant "asked either for the directory or asked a party within the store the number of the Ron-Jon Surf Shop. He made the telephone call, and asked what attorney or legal counsel did he get when he was in all that trouble." (Tr. 61).

*Statement Number Four:* Later during the search the defendant approached agent Charles Layman and asked if the person who sent the bag had been arrested, the agent answered it was "no concern of mine" and the defendant stated that it was his concern (Tr. 59, 73-75).

*Statement Number Five:* Near the end of the search and after the officers had seized the bag and its contents (Tr. 53, 54), deputy Sellers gave the defendant a copy of the warrant and an inventory of the items seized (Tr. 31, 32, 54, and see the return on the warrant). As the officers started to leave, inspector York

---

16. Tr. 31: "— As I entered the back door I noticed sitting on a table, a black bag, the one that has been identified here." (See also transcript at page 11).

advised the defendant, "You are free to go now." (Tr. 66, also see Tr. 4) ; the defendant asked, "Aren't you going to arrest anybody?" (Tr. 32, 61) ; the inspector asked, "Why?"; the defendant said, "That stuff in the bag is illegal, isn't it?" (Tr. 32, 61). Inspector York then testified — *"Immediately* upon making this statement I walked outside, and recorded that statement in writing on some personal notes that I have." (Tr. 32).

## Conclusion

The motion of the defendant to quash search warrant on all grounds urged, including that its issuance constituted a judicial act invalid because performed on a Sunday (Harrison v. Bay Shore Development, Fla. 1926, 111 So. 128), is denied.

### 1. *Does Miranda apply?*

The state contends that since the defendant was not arrested he was not in custody and the state can introduce into evidence his responses to interrogatories directed to him by the searching officers without first showing that he had been advised of his constitutional rights in the manner required by *Miranda* [17] and that he knowingly and intelligently waived those rights. Actual custody is not required, *Miranda* requires only that the defendant be "deprived of his freedom of action in any significant way."

The case most in point cited by counsel is that of People v. Wilson, 1968 Calif., 74 Cal. Rptr. 131, where during a search being made under a warrant the defendant was asked questions by the searching officers and her answers were suppressed. The court pointed out that the search warrant covered not only the premises but a search of the person of the accused. The court said, "It goes without saying that the defendant was not free to leave the area while the officers were conducting the search of the room" and that she was deprived of her freedom of action in a significant way.

The facts of this case as set forth above and in the footnotes show a more compelling instance of actual or constructive custody and an inherently psychologically coercive atmosphere. The defendant was and knew he was not only under suspicion but the target of the investigation; that the investigation had progressed to the point that the officers had probable cause to believe contraband had been delivered to his store; a search and arrest warrant had been issued for him and he was under restraint and had every reason to believe during the search that he was not free to leave except with the permission and under the supervision and control

---

17. Miranda v. Arizona, 1966, 384 U.S. 436; 86 S.Ct. 1602; 16 L.Ed.2d 694; 10 A.L.R. 3d 974.

of the police officers. *Miranda* should and does apply. The officers apparently thought it applied. They should not be able to circumvent its applicability and effect by the simple tactical expedient of merely deciding to defer an arrest until some subsequent date.

2. *Was Miranda warning properly given and rights intelligently waived before police interrogation?*

The vague, vacillating testimony set forth above, particularly in footnote 7, falls far short of the clear and convincing testimony that this trial court usually hears as to this question and which any court should require. The state has failed to meet its "heavy burden" — the "high standards of proof for the waiver of constitutional rights" *(Miranda)* — to establish to the satisfaction of this court by clear and convincing evidence that the defendant was properly advised of his constitutional rights in the manner required by *Miranda* and that he voluntarily, knowingly and intelligently waived those rights before he was interrogated by the searching police officers.

3. *Did the defendant waive his rights to counsel prior to and during the interrogation?*

The testimony and transcript references set forth in footnotes 10 and 11 clearly show that not only did the defendant not waive his right to have counsel present during questioning but that he and his brother made extensive efforts to obtain counsel. Under these circumstances he should not have been questioned until after counsel was secured. One good clear indication of a desire for counsel should preclude all further interrogation during the absence of counsel. See People v. Fioritto, Calif. 1968, 441 P.2d 625, 4 Cr. Law Bul. 433, 434; U.S. v. Priest, 409 F.2d 491.

> "If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. * * *
>
> "If the individual indicates in any manner, at any time prior to or during questioning that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. * * * If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda.*

Statement Number Three sought to be suppressed arose out of the very efforts of the defendant to obtain counsel who could represent him. Just as evidence that an accused exercised his

right to remain silent is inadmissible, see Galasso v. State, Fla. App. 1968, 207 So.2d 45, likewise this evidence that the defendant exercised his constitutional right to secure counsel should be inadmissible against him for this reason alone.

### 4. *Did the defendant volunteer any statements?*

Statements numbered One and Five were responses to questions of officers. Statement Number Two was induced as a result of a question or direction of an officer. Statement Number Three resulted from an attempt to secure counsel. All are suppressed and inadmissible at trial. However the court finds that Statement Number Four is a volunteered, gratuitous, spontaneous statement within the meaning of Anderson v. State, Fla. App. 1968, 207 So.2d 518; Battles v. State, Fla. App. 1968, 208 So.2d 150; Cameron v. State, Fla. App. 1968, 214 So.2d 370; and Hawkins v. State, Fla. App. 1969, 217 So.2d 582. *Miranda* does not apply to it and, subject to all other objections to its admissibility, its use at trial is not suppressed.

### 5. *Are the statements relevant and material?*

The persuasive and probative value and the legal relevancy and materiality of the statements in this case may not be apparent to some. The determination of the prosecution to get them into evidence might appear to be an effort to render a barrel of tallow from a few gnats. Those interested but not in the criminal courtroom every day may get a just appreciation of the state's burden of proving scienter in a joint possession of contraband case from a reading of Cohen v. State, Fla. 1961, 125 So.2d 560; Frank v. State, Fla. App. 1967, 199 So.2d 117; Kleinbard v. State, Fla. App. 1968, 208 So.2d 127; Markman v. State, Fla. App. 1968, 210 So.2d 486; Lattimore v. State, Fla. App. 1968, 214 So.2d 771; Chariott v. State, Fla. App. 1969, 226 So.2d 359.

All questions of admissibility on grounds other than the failure to give warnings as to constitutional rights (including whether the statements are sufficiently inculpatory to qualify as admissions and therefore exceptions to the hearsay rule) are not considered and are reserved for trial because the U. S. Supreme Court in *Miranda,* 384 U.S. 436, 474, 477, held that no distinction may be drawn between inculpatory and exculpatory statements, wisely observing that statements intended to be exculpatory by an accused are often used to impeach, to contradict and to negative innocence and thus to prove guilt by implication, and held such statements to be incriminating in any meaningful sense of the word and not to be used without the full warnings and effective waiver required for any other statement.